

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-18-00128-CR
No. 02-18-00129-CR

_____

SON T. DUONG, Appellant

V.

THE STATE OF TEXAS

On Appeal from Criminal District Court No. 3
Tarrant County, Texas
Trial Court Nos. 1500206D, 1500204D

Before Kerr, Bassel, and Womack, JJ.
Memorandum Opinion by Justice Kerr

## MEMORANDUM OPINION

A jury found Son T. Duong guilty of (1) aggravated assault with a deadly weapon and (2) unlawful possession of a firearm. After finding the repeat-offender notices true in both cases, the jury assessed Duong's punishment at (1) life in prison and a $10,000 fine for the former offense and (2) 20 years' imprisonment and a $10,000 fine for the latter. *See* Tex. Penal Code Ann. §§ 22.02(a)(2), 46.04(a). After the trial court sentenced Duong, Duong appealed, and in a brief encompassing both cases, he asserts four issues:

- First, the trial court violated his Sixth Amendment right to confront witnesses against him when he was denied the right to be present in court while the jury listened to and viewed audio and video recordings.

- Second, the evidence was insufficient to prove that he committed an aggravated assault because there was no direct evidence showing who shot the complainant.

- Third, the evidence was insufficient to prove that he committed the offense of unlawful possession of a firearm because "[t]here [was] no evidence of possession of the firearm other than his location in the vehicle."

- Fourth, the trial court erred in not ordering a competency examination after he attempted suicide and evidenced mental illness during the course of the trial.

We affirm.

### Evidentiary Sufficiency

Because Duong's second and third issues, his sufficiency complaints, would result in greater relief if granted, we address them first. *See Cox v. State*, No. 02-16-00400-CR, 2017 WL 4172604, at *3 (Tex. App.—Fort Worth Sept. 21, 2017, no pet.)

2

(mem. op., not designated for publication); *Mixon v. State*, 481 S.W.3d 318, 322 (Tex. App.—Amarillo 2015, pet. ref'd).

In Duong's second issue, he argues that the evidence was insufficient to prove that he committed an aggravated assault because there was no direct evidence showing that he was the person who shot the victim. And in his third issue, Duong contends that the evidence was insufficient to prove that he committed the offense of unlawful possession of a firearm because "[t]here [was] no evidence of possession of the firearm other than his location in the vehicle." Because circumstantial evidence shows what direct evidence does not, we disagree.

### Standard of Review

Federal due process requires that the State prove beyond a reasonable doubt every element of the crime charged. *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S. Ct. 2781, 2787 (1979); *see* U.S. Const. amend. XIV. In our due-process evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the crime's essential elements beyond a reasonable doubt. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt. *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016).

3

## A. The Evidence

Kevin Nguyen and Michelle Ngo were best friends and would talk to each other every day on the phone, but Ngo had not responded to any texts or calls in about two weeks. So Khang Bui and Nguyen drove over to Ngo's house around 3:00 a.m. on May 25, 2017, to check on her. Ngo lived with her five children and her nephew, Duong.

Shortly after Bui and Nguyen arrived, the garage door to Ngo's house opened, and Duong walked out of the garage and down the driveway with a gun in his hand. Seeing Duong's gun, Bui panicked and drove away, but Duong fired anyway and struck Bui in the back with one shot and grazed Bui's head with another.

The shooting prompted a series of 911 calls. A neighbor first called 911 reporting having heard shots fired around 3:29 a.m.; Bui called around 3:42 a.m.; and Nguyen called around 4:11 a.m.

Inside her house, Ngo heard the shots and then heard Duong come back indoors and say, "I'm going to go look for him," and "I'm going to shoot any MFer who comes over here," after which Duong left in his Camaro. Not until Nguyen called Ngo did she learn that Bui had been shot.

But Ngo herself waited until 4:20 a.m. to call 911. She explained that about two weeks earlier, surveillance cameras had been set up inside her house; there had already been an outside camera viewing the driveway, but interior cameras were added. Ngo testified that she was afraid to call the police because Duong could view the

4

surveillance cameras remotely. She also admitted stating in her 911 call that she was being held hostage in her home and, further, acknowledged telling Nguyen the same thing.

Officer Rene Sandoval, who responded to the shooting call, saw a surveillance screen in the kitchen and found the mainframe in Duong's bedroom closet. And the crime-scene investigator, Anna-Dia Tricksey, found another surveillance video screen in Duong's bedroom. Officer Sandoval described Ngo as being terrified because Duong knew where she was at any given moment, so Officer Sandoval adjusted the cameras to blind any onlooker.

Investigator Tricksey discovered that the driveway camera had captured the shooting. One video, in which Duong is facing the camera, showed Duong getting into his parked Camaro that night around 12:30 a.m. In a second video around 3:18 a.m., Duong, with his back to the camera but wearing the same clothing, can be seen with a gun in his right hand walking from the garage to the street where—according to Detective Russell Evans—Duong "almost does a jump move and both of his hands go up" and he is poised to start shooting.[1] Even viewing Duong's video

---

[1]The driveway light illuminates the driveway area but not the street; Bui's car's headlights, initially on the camera's left, temporarily illuminate the street as seen on the video. But by the time Duong reaches the street, Bui has driven off the screen to the right, and Duong steps into the darkness. Although the video is not entirely clear, Duong appears to hop into a crouching position associated with firing a pistol.

image from the back, Ngo could identify him. In addition, having seen Duong both in a photograph and in person, Detective Evans testified that the videos showed Duong.

When viewing the second video, Bui testified that it caught a man walking down the driveway with a gun in his hand and showed Bui's car driving away. But Bui, who had never met Duong or the father of Ngo's children (Vince), thought the man was Vince.

When Nguyen had called 911 that night, he identified the shooter as Ngo's nephew, not Vince. Nguyen did not testify at trial, however; Detective Evans explained that Nguyen was afraid and refused to help.

Nguyen's reluctance was not unique. Ngo herself was uncomfortable incriminating Duong, her sister's son, and did not want to testify. She maintained that the surveillance cameras were "mostly" her idea. Despite her reservations, Ngo acknowledged that the man in the videos looked like Duong, not like Vince, and that after Duong had left earlier that night to take a girl home, he came back before 1:00 a.m. and did not leave again until after she had heard the shots.

Vince—the father of Ngo's children or Ngo's "ex-husband"—lived in California. Although Vince had come by to visit the children once sometime within a week or two before the shooting, Ngo denied that anyone was in the house that night other than her and her children.

Later the same day as the shooting, the police arrested Duong after a "high risk" traffic stop. Police surveillance had located Duong and had seen him carrying

two bags and getting into the backseat of a white Lexus, behind the driver. When the police later pulled the Lexus over, Duong was alone in the backseat and still on the driver's side. In the backseat with him were a semiautomatic pistol visible on the floorboard where Duong was sitting, a credit card with Duong's name on it, and two black bags. The semiautomatic pistol was fully loaded. In the pocket attached to the passenger's seat's back was Duong's Louisiana ID card.

The magazine capacity of the semiautomatic pistol that the police recovered was ten rounds, and ten casings were precisely what Investigator Tricksey recovered from the shooting location; she also recovered several "projectiles" (bullets) from Bui's car. The bullet that the doctors had removed from Bui's body was collected as well.

A firearm and tool-mark examiner determined that the ten casings and four of the six recovered bullets—which included the one removed from Bui's body—were fired from the semiautomatic pistol that the police recovered when arresting Duong. Two of the six bullets were too damaged to make any kind of conclusion.

The State also introduced evidence that Duong had been convicted of a felony in 2011.

**B. Discussion**

A defendant's mere presence where an item such as a weapon is found does not suffice, by itself, to show actual care, custody, or control of the item. *See Evans v. State*, 202 S.W.3d 158, 162 (Tex. Crim. App. 2006). The State must prove that the

7

defendant knew of the weapon's existence and that he exercised actual care, custody, control, or management over it. *Belle v. State*, 543 S.W.3d 871, 875 (Tex. App.—Houston [14th Dist.] 2018, no pet.). If the firearm (or other item) is not found on the defendant, or if it is not in his exclusive possession, the State must offer additional, independent facts and circumstances affirmatively linking him to the firearm. *Id.* In this way, an innocent bystander will not be convicted solely because of his fortuitous proximity to a firearm. *Ramirez v. State*, No. 02-12-00077-CR, 2012 WL 4937103, at *2 (Tex. App.—Fort Worth Oct. 18, 2012, no pet.) (mem. op., not designated for publication). The evidence's logical force, not the number of connecting factors, determines possession. *Id.* at *3.

Here, the evidence was uncontradicted that Duong was a convicted felon, and the police found the semiautomatic pistol on the floorboard precisely where Duong was sitting in the backseat. No one else was in the backseat, and other items—such as Duong's ID and credit card—were in the same immediate area. Viewing the evidence in the light most favorable to the verdict, the logical force of the evidence allowed a rational juror to conclude beyond a reasonable doubt that Duong was a felon unlawfully in possession of a firearm away from the premises where he lived. *See Queeman*, 520 S.W.3d at 622; *Evans*, 202 S.W.3d at 162; *Belle*, 543 S.W.3d at 875; *Ramirez*, 2012 WL 4937103, at *3.

And the semiautomatic pistol that the police recovered when arresting Duong was the same one that had left shell casings outside Ngo's house and bullets in Bui's

8

car and body. The driveway video shows Duong leaving the garage with a pistol in his hand and Bui's car driving away. Although the video then shows Duong stepping into the darkness of the street and does not clearly show what Duong does once there, Bui's testimony and the physical evidence—the shell casings and the bullets—answer that question. A rational juror could find beyond a reasonable doubt that Duong intentionally or knowingly caused Bui bodily injury by shooting him with a firearm. *See Queeman*, 520 S.W.3d at 622.

We overrule Duong's second and third issues.

## Confrontation Clause

In Duong's first issue, he argues that the trial court denied him his Sixth Amendment right to confront witnesses when, during the jury's deliberations, it permitted the jury to listen to and view audio and video recordings in the courtroom without Duong's being present. We disagree.

### A. The Record

While deliberating, the jurors asked to see certain videos and hear certain 911 calls. In discussing this request with the attorneys, the trial court commented that reviewing the audio and video recordings would be easier in the courtroom. When questioned about whether Duong wanted to be present, defense counsel stated that Duong wanted both to be present and to "dress out"—that is, to wear street clothes. Duong had tried to commit suicide earlier in the trial by cutting his wrists and

9

according to the bailiff was "still in his moo-moo"[2]; the bailiff thought that allowing Duong to dress in regular clothes was ill-advised because Duong might try to hang himself in the holding cell. Defense counsel stated that he preferred that Duong not be present because "we can't . . . do anything" other than listen to the 911 recordings and watch the videos along with the jurors. The prosecutor expressed security concerns and misgivings that, "based on his behavior the last time we saw him in the courtroom," Duong might make an outburst before the jury, so she suggested turning on the "baby monitor" in the holding cell so that Duong could hear what was occurring. Stating that "this isn't new evidence or testimony," the trial court agreed to use the monitor, and defense counsel expressly stated that he had no objection because "[w]e believe that allows sufficient presence with the proceedings for my client."

But after the jury entered the courtroom and started reviewing the recordings, Duong began yelling from his nearby holding cell: "I wanted to be in court. I told my attorney I wanted to be in court." The trial court excused the jury and instructed the bailiff to put Duong on a different floor. The jurors later returned to the courtroom and completed their review, after which they went back to the jury room to continue

---

[2]Although the record does not explain what a "moo-moo" (more likely a *muumuu*) is, the context suggests that Duong was still wearing the jail-provided safety clothing to which the trial court had referred on the second day of trial: "And so understanding that it could hurt your case, you still want to wear what you have on, which is the jail clothing. And it's not even just a regular jail clothing, it's the safety clothing because of I guess what happened last night."

deliberating. With the jury absent, defense counsel then put on the record that one of the reasons he had not wanted Duong in the courtroom was because he feared that Duong would make an outburst like the one Duong had just made from his holding cell.

**B. The Standard of Review**

To a large extent, the constitutional right to be present is rooted in the Confrontation Clause of the Sixth Amendment. *United States v. Gagnon*, 470 U.S. 522, 526–27, 105 S. Ct. 1482, 1484 (1985). But in some situations where the defendant is not actually confronting witnesses or evidence against him, the Supreme Court has recognized that this right is protected by the Due Process Clause. *Id.*, 105 S. Ct. at 1484. A defendant has a due-process right to be present at a proceeding whenever his presence reasonably and substantially relates to the fullness of his opportunity to defend against the charge. *Id.*, 105 S. Ct. at 1484. The defendant's presence is a due-process condition only to the extent that his absence would thwart a fair and just hearing. *Id.*, 105 S. Ct. at 1484. The propriety of excluding a defendant from a trial proceeding should be considered in light of the whole record. *Id.*, 105 S. Ct. at 1484. If a defendant could have done nothing or had nothing to gain by attending, there is no violation. *Id.* at 527, 105 S. Ct. at 1484–85.

Providing an analogous example, in *Snyder v. Massachusetts* the trial court granted a motion to have the jury view the alleged crime scene but denied the defendant's motion to view the scene with the jury. 291 U.S. 97, 103, 54 S. Ct. 330, 331 (1934)

(Cardozo, J.).[3] Simply viewing the scene without comment from any source—which is similar to the jurors here reviewing recordings during deliberation without comment from the parties—was the Supreme Court's first topic: "At the outset, we consider a bare inspection and nothing more, a view where nothing is said by [anyone] to direct the attention of the jury to one feature or another." *Id.* at 108, 54 S. Ct. at 333. The Court concluded that this was a constitutional nonissue: "The Fourteenth Amendment does not assure to a defendant the privilege to be present at such a time. There is nothing he could do if he were there, and almost nothing he could gain." *Id.*, 54 S. Ct. at 333.

## C. Discussion

As defense counsel correctly pointed out, while the jurors reviewed the recordings there was nothing for anyone else to do. We hold that the *Snyder* rationale applies here and overrule Duong's first issue. *See id.*, 54 S. Ct. at 333.

---

[3]The Supreme Court later overruled *Snyder* twice on other grounds. *Duncan v. Louisiana*, 391 U.S. 145, 154–55, 88 S. Ct. 1444, 1450–51 (1968) (rejecting dicta in *Snyder* that "the right to jury trial is not essential to ordered liberty and may be dispensed with by the States regardless of the Sixth and Fourteenth Amendments."); *Malloy v. Hogan*, 378 U.S. 1, 6, 84 S. Ct. 1489, 1492 (1964) ("We hold today that the Fifth Amendment's exception from compulsory self-incrimination is also protected by the Fourteenth Amendment against abridgment by the States."). But both the Supreme Court and the Texas Court of Criminal Appeals have continued to cite *Snyder* for its discussion of a defendant's right to be present. *Kentucky v. Stincer*, 482 U.S. 730, 745, 107 S. Ct. 2658, 2667 (1987); *Routier v. State*, 112 S.W.3d 554, 576–77 (Tex. Crim. App. 2003).

## Competency

In Duong's fourth issue, he argues that the trial court abused its discretion in failing to order a competency hearing when Duong attempted suicide after the first day of testimony and made other self-defeating decisions and inappropriate outbursts during the trial. We disagree. For the reasons set out below, the trial court could have reasonably concluded that Duong was deliberately trying to sabotage the trial; it follows that the trial court did not abuse its discretion.

### A. Standard of Review

Putting an incompetent person to trial violates due process. *Turner v. State*, 570 S.W.3d 250, 262 (Tex. Crim. App. 2018). The code of criminal procedure sets out the parameters of competency:

> (a) A person is incompetent to stand trial if the person does not have:
>
> > (1) sufficient present ability to consult with the person's lawyer with a reasonable degree of rational understanding; or
> >
> > (2) a rational as well as factual understanding of the proceedings against the person.
>
> (b) A defendant is presumed competent to stand trial and shall be found competent to stand trial unless proved incompetent by a preponderance of the evidence.

Tex. Code Crim. Proc. Ann. art. 46B.003.

If the court determines that some evidence supports an incompetent-to-stand-trial finding, a jury is to be empaneled to determine the defendant's competency to stand trial. *Moore v. State*, 999 S.W.2d 385, 393 (Tex. Crim. App. 1999). In determining

13

whether evidence requires empaneling a separate jury to conduct a competency hearing, the trial court considers only the evidence tending to show incompetency and whether there is some evidence—a quantity more than none or a scintilla—that rationally could lead to an incompetency determination. *Id.* The same standard applies whether the issue is presented pretrial or during trial. *Id.* A competency hearing is not required unless the evidence is sufficient to create a bona fide doubt in the judge's mind whether the defendant meets the test of legal competence. *Id.*

On appeal, the standard of review is whether the trial court abused its discretion by not empaneling a jury to conduct a competency hearing. *Id.* Under the abuse-of-discretion standard, we defer not only to a trial judge's resolution of disputed facts, but also to the trial judge's right to draw reasonable inferences from those facts. *Cantu v. State*, 253 S.W.3d 273, 282 (Tex. Crim. App. 2008); *see McDonald v. State*, No. 02-17-00264-CR, 2018 WL 5289358, at *6 (Tex. App.—Fort Worth Oct. 25, 2018, pet. ref'd) (mem. op., not designated for publication); *Arroyos v. State*, Nos. 02-11-00135-CR, 02-11-00136-CR, 2012 WL 1555900, at *1 (Tex. App.—Fort Worth May 3, 2012, no pet.) (mem. op., not designated for publication).

**B. The Record (The Short Version)**[4]

An hour before trial was to start, Duong requested an opportunity to hire new counsel. After the trial court informed Duong that the trial would proceed, Duong refused to remain in the courtroom during voir dire. To accommodate him, the trial court put a monitor in Duong's holding cell so that he could listen to the proceedings.

During the first day of testimony, Duong was present in the courtroom and did nothing to disrupt the proceedings.

But that night, Duong tried to commit suicide. Later in the trial, the bailiff seemed skeptical about how serious this attempt was, describing the cuts to Duong's wrists as superficial and not requiring any stitches. Regardless, not dressed even in regular jail clothing but in "safety clothing," as we discussed above, Duong insisted on sitting in the courtroom against defense counsel's advice, which he succeeded in doing. Only moments after the jury was seated in the courtroom, Duong announced to the jurors that he had attempted to commit suicide and tried to show them his wrists. And only 26 minutes after the jury had entered the courtroom and the first witness had taken the stand, Duong insisted on a bathroom break. After that break, Duong refused to return to the courtroom, so trial resumed with Duong in his holding cell with the monitor.

---

[4]In the appendix, we provide more detailed summaries and lengthy excerpts from the reporter's record showing the dynamics among Duong, defense counsel, the trial court, and ultimately the bailiff. For attorneys facing a similar situation, the appendix might prove insightful.

During the afternoon, defense counsel reported that Duong wanted to remain in his holding cell. But after the State rested, the trial court had Duong brought back to the courtroom, where he remained mute and refused to answer any questions, so he was returned to his holding cell. After the jury retired to deliberate, it sent a note asking to review some of the videos and 911 recordings; the trial court decided that, given the late hour, the jurors would review the requested items in the courtroom the following day.

That next morning, Duong not only wanted to be in the courtroom while the jurors reviewed the 911 recordings and the videos, but he also wanted to "dress out." The bailiff opined that putting Duong in regular clothing presented a security risk because Duong might try to hang himself in the holding cell (presumably with one of the separate items of clothing). For his part, defense counsel preferred that Duong not be in the courtroom because they would only be observing the jurors watching videos and listening to recordings. And the State was concerned that Duong would make another outburst, so it recommended leaving Duong in his holding cell with the monitor, which was the course of action that the trial court took.

Once the jurors were in the courtroom, though, Duong began yelling from his holding cell that he wanted to be in the courtroom. After the trial court sent the jurors back to the jury room, the bailiff moved Duong to a holding cell on another floor.

Later, after the jury had finished deliberating and notified the trial court that it had rendered verdicts, the trial court brought Duong back to ask him if he wanted to

be present for the verdicts. Duong indicated that he did not. But once Duong was back in his holding cell, Duong again made such a racket that the trial court again had him moved to a different floor. After the jury announced its guilty verdicts, the punishment trial began.

The next day, when the punishment trial resumed, defense counsel informed the court that he had seen Duong and that Duong refused to answer any questions. Defense counsel reported, "So he's expressed a desire not to be present or participate, Judge." The punishment trial resumed.

But later, when the jury retired to deliberate on punishment, the trial court had Duong brought back. This time, however, Duong so actively resisted the bailiff that the trial court had Duong sent back to the holding cell where, once again, Duong was provided a monitor so that he could listen to the proceedings.

## C. Discussion

Deferring to the trial court's resolution of disputed facts and its right to draw reasonable inferences from those facts, we conclude that the trial court could have reasonably decided that Duong was deliberately trying to abort the trial or to seed the record with reversible error, either of which showed that Duong understood the nature of the proceedings. *See* Tex. Crim. Proc. Code Ann. art. 46B.003(a); *Cantu*, 253 S.W.3d at 282. The evidence was insufficient to show a bona fide doubt about Duong's competency to stand trial. *See Moore*, 999 S.W.2d at 393.

17

Regarding a disruptive defendant, the court of criminal appeals has written, "While appellant's comments were inappropriate violations of court decorum, they do not constitute evidence of his inability to communicate with counsel, or factually appreciate the proceedings against him." *Id.* at 395. "To the contrary," the court continued, "appellant's outbursts were timely, topical, and logically related to the questions and answers offered during the examination of other witnesses." *Id.* The court concluded, "We reject appellant's contention that his unruly and disruptive courtroom demeanor are probative of incompetence to stand trial. If such actions were probative of incompetence, one could effectively avoid criminal justice through immature behavior." *Id.* We agree. On this record, the trial court could reasonably conclude that it was facing a disruptive but competent defendant intent on stopping the trial; we thus hold that the trial court did not abuse its discretion by not having a competency hearing.

We overrule Duong's fourth issue.

### Conclusion

Having overruled Duong's issues, we affirm the trial court judgments.

18

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  July 25, 2019

# APPENDIX

## I. March 19, 2018 (Voir Dire)

Before voir dire, the State made a plea-bargain offer that Duong, defense counsel, and the court discussed on the record and that Duong ultimately refused. When the trial court asked defense counsel if he wanted to put anything else on the record, counsel responded that Duong had just informed him that he wanted a different attorney and wanted to hire private counsel. Because the case had been pending about a year and because the trial was set to start in an hour, the trial court declined to give Duong more time to hire an attorney and informed Duong that unless he hired new counsel within the next hour, Duong's trial was proceeding with his current lawyer.

The trial court then asked whether Duong was competent to proceed, and defense counsel asserted that Duong was. But defense counsel also put on the record that Duong, against counsel's advice, had requested not to be present during voir dire.

During that discussion, Duong returned to the issue of hiring new counsel and decried the unfairness of not giving him more time to do so, to which defense counsel responded, "This is the first time I've ever heard him actually articulate to me he wishes for me to withdraw." Defense counsel continued, "He told me earlier today he's not dissatisfied with me, but he would feel more comfortable with his own lawyer." When Duong grumbled again about having only an hour to hire new counsel, defense counsel said, "Well, I understand that. But I cannot get into the conversations

I've had with my client. I just did want an opportunity to say I intend to do my very best for him." Counsel added, "I have not heard any complaints in my performance and I heard the opposite of it even as recently as an hour ago." Duong countered that he had written to defense counsel back in December 2017 asking him to withdraw but that defense counsel had never replied. The trial court noted that the present trial had been set back in January 2018, and ended the new-attorney discussion with these comments: "You have one of the best lawyers in the State of Texas. So he tells me he's ready for trial, and so we're going to go to trial today."

When the discussion returned to whether Duong wanted to remain in the courtroom for voir dire, Duong persisted in his request to not be present. So that Duong could listen to the proceedings, the trial court set up a monitor in Duong's holding cell.

## II. March 20, 2018 (The First Day of Testimony)

Duong did not engage in any disruptive behavior during the first day of testimony.

## III. March 21, 2018 (The Second Day of Testimony)

### A. The Day Begins

THE COURT: Right here, sir. Good morning.

THE BAILIFF: Hands behind your back.

THE COURT: How are you, Mr. Duong?

THE DEFENDANT: (Moving head side to side[.)]

21

THE COURT: How are you this morning?

THE DEFENDANT: I was in a suicide watch tank. How do you think I am.

THE COURT: I heard that. I'm just checking on you this morning.

So, we're about to start the trial. And you, you know, obviously, you have the right to be out here during the trial. If you don't want to be out here during the trial, you don't have to be. That's your choice. And also, what you wear if you are out here is your choice as well.

So, I'm hearing, and correct me if I'm wrong, that you do want to be out here, but you don't want to put on your other clothes, you want to wear what you have on. Is that right?

THE DEFENDANT: Yeah.

THE COURT: And you understand that that could hurt you with the jury. And so understanding that it could hurt your case, you still want to wear what you have on, which is the jail clothing. And it's not even just a regular jail clothing, it's the safety clothing because of I guess what happened last night. Is that—do you understand that?

THE DEFENDANT: (Moving head up and down[.)]

THE COURT: I can't hear you.

THE DEFENDANT: Yes.

THE COURT: So basically you would be waiving your rights to have the jury not know that you're in jail because right now they don't know you're in jail. So, obviously, if you came out like that, they would know that you're in jail, which is fine if that's what you—if that's what you decide.

I just want to make sure you understand that if you do come out that way, it's not going to be an issue to appeal because you're basically waiving it. But if you put on your regular clothes, they won't know that you're in jail. Okay. So, but it's your decision.

So do you want to come out here in regular clothes or do you want to come out here in those clothes?

THE DEFENDANT: I'm going to wear this.

THE COURT: All right. I just want to be clear on the record so that everything that—that's your decision even though you know that it might hurt you in trial.

THE DEFENDANT: (Moving head up and down[.)]

THE COURT: Okay? Is that your understanding?

THE DEFENDANT: Yes.

THE COURT: Anything else?

[DEFENSE COUNSEL]: Judge, I just had a few questions.

THE COURT: Sure.

[DEFENSE COUNSEL]: [Duong], I can't talk to you about anything we've talked about in this courtroom because that violates certain privileges, so I'm just going to ask you now.

If I were to tell you now that I believe coming out in your present clothing is the biggest mistake of your life and you are virtually going to convict yourself and literally beg you to wear civilian clothing, will that change your mind?

THE DEFENDANT: No.

[DEFENSE COUNSEL]: Okay. You expressed to me that you're concerned about my performance; is that true?

THE DEFENDANT: I've been telling you this.

[DEFENSE COUNSEL]: Okay. Well, this morning you did?

THE DEFENDANT: I've been telling you I don't want you as my attorney.

[DEFENSE COUNSEL]: Okay. In any event, you understand we're about to proceed with the rest of your trial and we expect that there are going to be some other witnesses that the State are going to call. Do you understand that?

THE DEFENDANT: Yeah.

[DEFENSE COUNSEL]: Nothing more at this point, Your Honor.

THE COURT: Okay. Anything else from the State?

Sure. Have a seat right over there.

(Discussion off the record.)

[DEFENSE COUNSEL]: Your Honor, may I make another few more statements on the record that I think would be pertinent on appeal if this gets that far.

THE COURT: Sure.

[DEFENSE COUNSEL]: Your Honor, I've seen Mr. Duong in various court settings, in other settings for nearly ten months. He's always had an understanding what a court is, what the purpose of this trial is, the impact it can have upon his liberty. He has talked to me about various sophisticated issues regarding physical evidence, whether it be fingerprint and alibi and whereabouts. I have never had an indication that I felt he did not understand what was going on.

I do at this point have concerns about his mental health, and so I cannot make any representation to the Court at this point that I have any concerns about his competence. But in an abundance of caution with this particular issue here, I would bring it to the Court's attention that I guess there is a question about his mental health. But I do not have any facts that would lead me to believe that he does not understand the proceedings against him or that he could not assist in his own defense.

THE COURT: Right. And he clearly just stated that he's competent enough to know that he doesn't want you as his lawyer.

[DEFENSE COUNSEL]: Yes, sir.

THE COURT: So he's making decisions. And if he chooses not to help you, that doesn't make him not—not competent.

[DEFENSE COUNSEL]: Yes, sir.

THE COURT: I mean, he's demonstrated all the way through that he understands where we are, what we're doing, his decisions about what he wears, he's very, you know, articulate about that and understands the risks.

[DEFENSE COUNSEL]: Yes.

THE COURT: And so, I don't have a question as to his competency.

[DEFENSE COUNSEL]: Thank you.

And just the last thing on the record. I've also received no indication of hearing voices or any delusional behavior or anything else that what I—that I would feel would raise an obligation that I would have to request a motion for competency at any point in our representation.

THE COURT: All right.

THE DEFENDANT: How would you know any of this?

THE COURT: I didn't ask you to talk.

Anything else from the Defense?

[DEFENSE COUNSEL]: We have another motion that's not related to this issue that we wish for the Court to pass on that I filed.

THE COURT: Okay.

## B. The Jury Enters the Courtroom

THE COURT: I just wanted to make sure they were back there.

Okay. Let's bring in the jury.

(Jury seated in the courtroom at 9:20 a.m.)

THE COURT: Thank you. Please be seated. And—

THE DEFENDANT: I tried to kill myself this morning and they still—

[DEFENSE COUNSEL]: Objection, Your Honor.

25

THE COURT: You need to be seated, sir.

You may proceed.

## C. While the First Witness is Testifying

[DEFENSE COUNSEL]: Your Honor, may we approach the Bench real quickly? I'm sorry.

THE COURT: Yes.

(At the Bench, on the record.)

[DEFENSE COUNSEL]: Sorry, my client is repeatedly requesting to go to the bathroom and threatening to walk into the holdover . . . .

THE COURT: All right.

(Bench conference concluded.)

THE COURT: Let's take a short break, if the jury will retire to the jury room, please.

[DEFENSE COUNSEL]: Thank you, Judge.

(Jury leaves the courtroom at 9:46 a.m.)

[DEFENSE COUNSEL]: Thank you, Your Honor.

(Recess from 9:46 a.m. to 10:05 a.m.)

(Open court, Defendant and jury not present.)

THE COURT: So we're on the record outside the presence of the jury. I've been made aware that the Defendant does not wish to be in the courtroom, so we'll proceed in that fashion. Both sides ready for the jury?

[SECOND PROSECUTOR]: Baby monitor.

THE COURT: We've got the monitor so he can hear everything that's going on.

[DEFENSE COUNSEL]: Okay. Yes, sir. Defense is ready to proceed.

THE COURT: Okay. Let's bring in the jury.

(Jury seated in the courtroom at 10:05 a.m.)

THE COURT: All right. Thank you. Please be seated.

## D. That Afternoon

Around 2:00 p.m., defense counsel put on the record that he had conferred with Duong and that Duong did not want to leave the holdover cell.

## E. After the State Rests

After the State rested, the trial court excused the jury and had Duong brought before him.

(Defendant present.)

THE COURT: Okay, sir.

Let's have him have a seat right there.

And the Defense may proceed.

[DEFENSE COUNSEL]: [Duong], I wanted to ask you a few questions because you have rights under our system that I cannot waive or enforce. I had spoken to you earlier, but more important I wanted to let you know now we are at the part of the trial where if you wanted to testify it would be appropriate to do so.

And I wanted to begin by asking if you—if you understand you have every right to take the witness stand in this case and give an account and your side of the story in this trial.

(No response.)

[DEFENSE COUNSEL]: If I were to ask you to please answer the question, would you do so, sir?

(No response.)

27

THE COURT: What's—restate the question.

[DEFENSE COUNSEL]: My question is, does he understand.

Do you understand, [Duong], that you have every right to testify in this trial?

(No response.)

THE COURT: Do you understand that, sir?

(No response.)

THE COURT: Okay. He's unwilling to participate, so.

[DEFENSE COUNSEL]: May I just ask one or two more questions just for the record.

THE COURT: Sure.

[DEFENSE COUNSEL]: I don't want to belabor anything.

[Duong], did I discuss this with you a few moments ago and you stated to me you did not want to testify when you were back in the holdover?

(No response.)

[DEFENSE COUNSEL]: I have nothing else, Your Honor. I don't know where else to proceed.

THE COURT: Okay. All right. Mr. Duong, do you have any questions for me?

(No response.)

THE COURT: Okay. I'll take it by your silence that you do not.

[DEFENSE COUNSEL]: Your Honor, do you want me to inquire about separation of the jury?

THE COURT: Sure, hold on one second, sir.

Go ahead.

[DEFENSE COUNSEL]: Mr. Duong, I have to ask you, are you willing to allow this jury to separate during deliberations? We expect there's going to be a closing argument and they will decide whether you are guilty or not. Are you willing to allow them to go home if they do not reach a conclusion by the end of business hours today?

(No response.)

THE COURT: Okay. Thank you.

[DEFENSE COUNSEL]: Thank you, Judge.

(Defendant removed from the courtroom.)

[DEFENSE COUNSEL]: Your Honor, may I put a few things on the record just so it reads clearly.

THE COURT: Sure.

[DEFENSE COUNSEL]: First and foremost, and your response has seemed to make clear, but just in case there's any question, my client did not answer any of my questions whether it had to do with separation or a willingness to testify. This is the first time that he has not spoken to me with repeated questioning.

Once again, I want to reiterate I have never received indication that he doesn't understand what's going on around him. I have no right to say whether this is a ploy or not, but I can tell you that I have seen nothing that has shaken my confidence that we are legally obligated and prepared to—to proceed to trial.

And so, with that, I—the document I'm going to want to submit as an offer of proof at some point while the jury is deliberating to talk about the number of times he's been visited by myself and other professionals within our firm and some of his behavior during the pendency of this matter.

THE COURT: Okay.

[DEFENSE COUNSEL]: Not only at trial.

THE COURT: All right.

[DEFENSE COUNSEL]: Thank you, Judge.

## F. After the Jury Retires to Deliberate

After the jury retired to deliberate, it sent a note requesting to listen to and watch some of the recordings, and the trial court decided to have the jurors do so in the courtroom on the following day.

## IV. March 22, 2018 (The Jury Renders Guilty Verdicts; the Punishment Phase Starts)

## A. The Day Begins

THE COURT: . . . . So have we inquired of the Defendant if he wants to be out here during this?

[DEFENSE COUNSEL]: He said he wants to come out today and he said he wants to dress out. The bailiffs have expressed a security concern about him dressing out. But this morning he wants to be out here.

THE COURT: Is he ready to come out?

THE BAILIFF: He's still in his moo-moo.

Up to you, your call. Security-wise I don't think we should put him in regular clothes just because I think he'll try to hang himself back there. We do have officers keeping an eye on him back there, though.

THE COURT: And that's due to some things he did two nights ago?

THE BAILIFF: Yes, sir. He tried to kill himself already by cutting his wrist even though it's superficial, no stitches needed.

THE COURT: [Defense counsel], do you want him out here?

[DEFENSE COUNSEL]: My preference is for this I don't think he needs to be out here. You know what I mean. I didn't—I don't know that it's a constitutional import that he's present for the jury to watch something that we can't present evidence or attack or cross-examine or do anything with. I mean, we're stuck just watching it with them, I guess.

30

THE COURT: What's the State's position?

[FIRST PROSECUTOR]: I would agree that if the Court has some security concerns about his presence, that we could turn the baby monitor on so that he could hear the evidence that was being played for the jury.

I think there's also, based on his behavior the last time we saw him in the courtroom yesterday, I think there is some potential concern about outbursts from him in front of the jury, which at this point in the trial since all the evidence is closed, I'm not sure what the cure would necessarily be or the remedy if he does make some type of outburst.

THE COURT: Right. Okay. And the jury has been instructed to not consider his previous outburst and this isn't—this isn't new evidence or testimony. So, we'll do the baby monitor right now so he can hear what's going on back there. And then if and when there's any other evidence and if there's another phase, then we can either bring him out the way he is or change his clothes. Okay.

[DEFENSE COUNSEL]: And the formal position just from the Defense, we have no objection with the baby monitor. We believe that allows sufficient presence with the proceedings for my client.

THE COURT: Okay. All right. Let's bring in the jury.

## B. While the Jurors Review the Recordings

(911 Recordings played.)

(Defendant yelling from holdover cell.)

THE DEFENDANT: I wanted to be in court. I told my attorney I wanted to be in court.

THE COURT: All right. The jury can go in the jury room, thank you.

(Jury leaves the courtroom at 9:12 a.m.)

THE DEFENDANT: I told you I wanted to be in court. Told you I wanted to come out.

31

THE COURT: So there was just . . . one 911 tape that needs to be called.

[FIRST PROSECUTOR]: You can send the disk back.

THE DEFENDANT: I want to go to court.

THE COURT: And let's go ahead and do that.

[FIRST PROSECUTOR]: And, Judge, we would request that we be able to send back all of the evidence that they requested in the event that they would like to view it again in light of the—

THE COURT: Yes, we will do that.

[SECOND PROSECUTOR]: Will the record reflect the outburst?

THE COURT: Yes.

THE DEFENDANT: I want to go to court. I want to go to court. This is—

THE COURT: Can we put him on a different floor?

THE BAILIFF: Yeah, you bet you.

[DEFENSE COUNSEL]: I'm going to talk to him and inform him of what's going on.

(Recess at 9:15 a.m. until 9:29 a.m.)

## C. **After the Jurors Return to the Jury Room**

THE COURT: Go ahead.

[DEFENSE COUNSEL]: Thank you, Your Honor.

First and foremost, I don't know if the record showed it or not, but when the jury was viewing some requested exhibits pursuant to note number one about 15 to 20 minutes ago, my client was verbally yelling that he wanted to be in the courtroom, and it was so loud that the Court immediately asked for the jury to go into the jury room. Right after that he was highly critical of me and wanted to fire—

32

THE COURT: Brittany, hold on.

[DEFENSE COUNSEL]: I wanted to express—

THE COURT: [Deputy], tell her to hold on.

[DEFENSE COUNSEL]: Oh, sorry. That it was because of an outburst like that, that was the thinking behind me not wanting him being present while the jury was in effect deliberating in the courtroom watching exhibits.

. . . .

THE COURT: And—and the Court will inquire, any of those meetings you've had with him, with you or your office or your investigator, there's never been a concern on your part of his competency; is that correct?

[DEFENSE COUNSEL]: There has never been.

THE COURT: All right.

[DEFENSE COUNSEL]: Unfortunately, there seems to be a pattern that—first off, I have not heard of any mental concerns until yesterday he articulated to me for the first time. But even among those conversations, I've never seen any demonstration of a confusion as to the proceedings, a confusion as to what he's accused of, or any problems with the strategy.

He has consistently maintained that he is not the shooter and he—I suspect that his behavior is a reaction expressing the appreciation for these proceedings that he has, that it flies in the face of the idea that he's incompetent.

THE COURT: He's just been consistently disruptive.

[DEFENSE COUNSEL]: Yes, sir. And I would say that—and I don't mean to betray my client, but it appears that the severity of the disruption seems to be in proportion to the level of evidence that the State has put into the record.

THE COURT: Right. And when he comes out later, whenever we—if we go to another phase, I'll make it clear that he has been disruptive, and

33

if he wishes to be out here, this is pretty much his third chance to not be disruptive. And if he is again, then he won't come back.

[DEFENSE COUNSEL]: Yes, sir. And I don't know if—and if I did this yesterday, forgive me. Yesterday in a proceeding he was present and he exclaimed that he had made a suicide attempt loud enough that I think everyone in the courtroom could hear. But I think the record would also reflect he tried to show his wrists in an effort to show purported injuries of that suicide attempt.

THE COURT: Right. Yes.

## D. The Court Learns that the Jury has Rendered Verdicts

(Open court, Defendant present, jury not present.)

THE COURT: You can sit by the table.

Okay. We're outside the presence of the jury. The jury has notified us they have reached verdicts in both cases.

Mr. Duong, do you want to be out here for the verdicts or not?

THE DEFENDANT: (Moving head side to side[.)]

THE COURT: You do not? I can't hear you?

You shook your head no, is that a no?

THE DEFENDANT: (Moving head side to side.)

THE COURT: Okay. I'll take it as a no. All right. Thank you very much.

[DEFENSE COUNSEL]: Your Honor, I'm so sorry. If the verdict is guilty, we're going to go into a punishment proceeding.

THE COURT: Correct, yes.

[DEFENSE COUNSEL]: I take it that he's not wanting to be present for that.

THE COURT: Hold on a second. I'll ask it in that fashion.

34

Mr. Duong, if it is a guilty verdict, do you want to be out here for the punishment phase or not?

(No response.)

THE COURT: I'll take it by your silence you do not.

Off the record.

(Discussion off the record.)

(Open Court; Defendant and jury not present.)

THE COURT: Let the record reflect that he is banging and making a bunch of noise, so I'm not going to have him here on this floor. Any objection to that?

[DEFENSE COUNSEL]: May I have—may I talk to him for 30 seconds?

THE COURT: Sure.

[DEFENSE COUNSEL]: Just in case he claims that it's because he has something to tell me.

THE COURT: All right.

(Recess at 10:07 a.m. until 10:08 a.m.)

(Open court, Defendant and jury not present.)

[DEFENSE COUNSEL]: Your Honor, he has stopped talking to me. And he—I asked him specifically can you assure me you won't make any disruptions, I think you're hurting your case, he did not give me any answer to that question.

THE COURT: Okay.

[SECOND PROSECUTOR]: Can the record reflect that he resumed kicking after [defense counsel] talked to him?

THE COURT: Yes.

## V. March 23, 2018 (The Punishment Trial Resumes)

### A. The Day Begins

(OPEN COURT; DEFENDANT AND JURY NOT PRESENT)

THE COURT: Ready?

[DEFENSE COUNSEL]: Yes. If I can just state on the record, Your Honor, very quickly. I went to the county court holdover on the same floor of this building just a moment ago and tried to make contact with my client Son Duong. He would not answer me. I specifically asked him if he wished to be present, he would not answer.

I explained to him he had a right to testify and asked whether he'd like to testify, he would not answer. And I asked if there's anything I could do on his behalf and he would not answer. So he's expressed a desire not to be present or participate, Judge.

THE COURT: Okay.

### B. After the Jury Retires to Deliberate

THE COURT: Mr. Duong, we have a—

THE DEFENDANT: You're breaking my arm.

THE BAILIFF: Relax.

THE DEFENDANT: You're breaking my arm right now.

THE BAILIFF: I'm not breaking your arm.

THE DEFENDANT: Yes, you are.

THE BAILIFF: No, I'm not.

THE DEFENDANT: You're breaking my arm right now.

THE BAILIFF: I'm not breaking your arm.

THE DEFENDANT: I am relaxed.

THE BAILIFF: Okay. I am too.

36

THE DEFENDANT: No, you're not, you're breaking my arm right now.

THE BAILIFF: No, if I crank down on it I will.

THE DEFENDANT: You're breaking my arm right now.

THE BAILIFF: I'm not either.

THE COURT: Okay.

THE DEFENDANT: I'm not even—I'm not even . . . flexing, okay.

THE BAILIFF: Okay. I'm not clamping down.

THE DEFENDANT: Yes, you are.

THE BAILIFF: No. If I clamp down, you'll know it.

THE DEFENDANT: You're breaking my arm right now.

THE COURT: Okay.

THE BAILIFF: Listen up to what the Judge is telling you.

THE COURT: So, Mr. Duong, we have a verdict. And are you going to be able to behave so that you can be in the courtroom?

THE DEFENDANT: You're breaking my arm.

THE BAILIFF: No, I'm not.

THE DEFENDANT: Yes, you are.

THE COURT: Okay. Go ahead and put him back.

(Defendant leaves courtroom.)

THE COURT: All right. So we've got the monitor set up? So the monitor is set up; is that correct?

THE BAILIFF: Let me double-check.

THE COURT: So let the record reflect when the Defendant was brought into the courtroom to receive the sentence from the jury, he was actively resisting.

Deputy . . . , is that correct?

THE BAILIFF: Yes.

THE COURT: And if you had let—let go of him, what was your concern?

THE BAILIFF: Well, that he would charge or stand or do something disruptive in that way to get—

THE COURT: So.

THE BAILIFF: Or even tried to head butt me while I had him in the wristlock, which doesn't cause any harm to him.

THE COURT: So I'm going to find that he's voluntarily absented himself again from the proceedings. We do have the monitor set up where he can hear the verdict and receive the verdict as it's read from the holdover.

But we've—throughout this whole trial we have attempted to give this Defendant every opportunity to be in the courtroom, and he has chosen time and time again to disrupt and—and now resist even being brought into the courtroom. So we're going to go ahead and receive the verdict at this time.

## VI. March 28, 2018 (Sentencing with Duong Present)

Duong appeared before the trial court, and the trial court sentenced him. When the trial court asked Duong if he understood his sentences and his appellate rights, Duong refused to respond.